Max & Lilli CLAUSEN, dba Clausen Oysters, Plaintiffs,

v.

M/V NEW CARISSA, in rem, Taiheiyo Kaiun Co., Ltd., Green Atlas Shipping, S.A., TMM Co., Ltd., Benjamin Morgado, The Britannia Steam Ship Insurance Association Limited, William Milwee, Gallagher Marine Systems, Inc., and Does 1 through 50, Defendants.

No. Civ. 00–6078–TC.

United States District Court, D. Oregon.

Aug. 27, 2001.

David C. Tarshes, Davis Wright Tremaine, Seattle, WA, Eric L. Dahlin, Everett W. Jack, Jr., Davis Wright Tremaine, LLP, Portland, OR, James P. Walsh, David Wright Tremaine LLP, San Francisco, CA, for Max Clausen, Lilli Clausen.

Craig C. Murphy, Wood Tatum Sanders & Murphy, Portland, OR, for N/V New Carissa.

Craig C. Murphy, Robert I. Sanders, Todd A. Zilbert, Wood Tatum Sanders & Murphy, Portland, OR, for Taiheiyo Kaiun Co. Ltd.

Robert I. Sanders, Todd A. Zilbert, Wood Tatum Sanders & Murphy, Portland, OR, for Green Atlas Shipping SA, TMM Co. Ltd.

## ORDER

COFFIN, United States Magistrate Judge.

Defendants have filed a motion for judgment as a matter of law and in the alternative for a new trial (# 211), which is founded upon three grounds: the testimony of Dr. Elston, the admission into evidence of an "oil sheen" regulation, and a jury instruction regarding multiple causation.

### *BACKGROUND*

On February 4, 1999, the M/V New Carissa ran aground on the Oregon Coast just north of the entrance to Coos Bay. Beginning February 8, the vessel began to leak oil. Ultimately, 70,000 gallons of oil were spilled into the ocean.

On February 12, 1999, an oil sheen was detected inside Coos Bay. New Carissa oil particles and tarballs reached the plaintiffs' oyster beds, and within a matter of weeks approximately three and a half million of the oysters died.

The trial was focused solely on the question—what killed the oysters? [1]

Plaintiffs indicted the New Carissa oil as the culprit. The defense denied the charge and laid the blame on excessive rainfall.

In presenting their case, plaintiffs called Dr. Ralph Elston, a distinguished marine biologist with considerable expertise in the study and diagnosis of disease in shellfish, who testified that the oysters died as a result of coming into contact with New Carissa oil particulates, which caused lesions in the gills of the shellfish, leading to bacterial infection, resulting in their demise.

The defense countered with Dr. Jerry Neff, an expert with similar credentials in the field of shellfish mortality, who testified that oil was not the cause of the oyster deaths, but rather they died because of low salinity in Coos Bay (caused by heavy rainfall leading to increased freshwater streamflow into the estuary). Dr. Neff rebutted Dr. Elston's conclusions as being unsupported by research, stating that Dr. Elston's concept of "contact toxicity" at relatively low levels of oil exposure, where there was no bioaccumulation of petroleum hydrocarbons in the tissues of the oysters, was foreign to biologists' current understanding of aquatic toxicology.

Dr. Neff further concluded that plaintiffs' oysters were stressed and ultimately died because of low levels of salinity in the bay at the location of their beds. As Dr. Neff explained, the natural environment of oysters is the ocean, where salinity levels (salt per thousand parts of water) are approximately 34–35 parts per thousand (ppt). But the ocean is not conducive to oyster farming, in part because the oysters' natural predators would ravage the beds. Thus oyster beds are planted in estuaries such as Coos Bay, which have influxes of ocean water through tidal action as well as fresh water (rivers and streams). The goal is to plant the beds where the salinity level is such that the

---

1. The court struck plaintiffs' negligence claim prior to trial, and the only issue on the remaining oil pollution strict liability claim was causation.

predators won't go there but the oysters will still thrive.

According to Dr. Neff (whose testimony was not disputed on this point by Dr. Elston), oysters do quite well in water that has a salinity level of 20 ppt or above. Lower than 20 ppt, the oysters become slightly stressed and their filtration rate (i.e., pumping water and feeding through the gills) decreases. At 13 ppt or lower, there is more stress and marked reductions in pumping. At prolonged exposure to 8 ppt salinity conditions, oysters begin dying in large numbers.

Dr. Neff acknowledged, however, that oysters can tolerate low salinity for "a long time." Essentially, when salinity levels fall beneath a tolerable level, the oyster closes its shell and ceases to filter water, thus depriving its tissues of oxygen. An oyster can remain in this closed condition for weeks, but eventually it will use up all its natural reserves and die. When death is caused by this mechanism, the tissue decays and putrefies, and the oyster emits a rotting, sulphurous odor. In addition, as the tissues are depleted of oxygen, they turn acidic, resulting in etching of the inside of the shell.

Dr. Neff, however, did not opine that the Clausen oysters died because of anaerobic low salinity mortality (the process described above). Notably, these oysters did not present the strong odor nor the etching of shells that are characteristic of such an event (an observation that Dr. Elston shared, and which, in part, caused him to reject low salinity as the cause of death). Rather, Dr. Neff testified that the oysters were exposed to low salinity, "not sufficiently low to cause this anaerobic response, but sufficiently low to stress the oysters and over a long period of time to cause the histopathological lesions in the gills that Dr. Elston reports."

Dr. Elston disputed the findings of Dr. Neff. Important to him, the oysters did not exhibit the characteristics associated with anaerobic low salinity mortality. Moreover, he reviewed data that disclosed that the Clausen oysters had been exposed to higher rainfall periods and lower salinity levels in prior years without fatalities. Dr. Elston also noted that the infrequent salinity testing conducted by the State Department of Agriculture in Coos Bay during the 1998–99 winter months (several samples per month) revealed little about actual salinity levels, because saltwater concentration changes with the ebb and flow of the tides. According to Dr. Elston, an oyster can endure long periods of low salinity by simply "shutting down", and periodically tests salinity conditions, opening up to feed, filter, etc. whenever tidal influences raise salinity levels to acceptable levels, and thus "reestablish its equilibrium." Dr. Elston further explained that one would have to take salinity readings approximately every 15 minutes to have accurate data regarding salinity levels at any one point in the bay, because of the fluctuating influence of tidal action.

Accordingly, Dr. Elston "ruled out" low salinity as the cause of the oysters' lesions, and concluded that "there is no other explanation for the oyster mortality" than the New Carissa oil exposure.

### 1. Dr. Elston's testimony and the court's gatekeeping function under Daubert.

Defendants vigorously contend that plaintiffs' case never should have been submitted to the jury, arguing that the absence of prior studies regarding the effects of low levels of oil contact on oysters reduced Dr. Elston's opinion to unreliable science, inadmissible under the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

■ The court previously rejected this argument in ruling on defendants' motions in limine seeking to bar Dr. Elston's testimony at trial. (Order of June 11, 2001, # 183) I continue to be persuaded that the basis for Dr. Elston's opinion is reliable enough to pass muster under *Daubert*, and so I affirm my earlier ruling with the following additional observations.

First, I find it noteworthy that the possible causes of the oyster mortality in this case were quite finite and identifiable. Both experts agreed that there were six possible causes or explanations for the three and a half million dead shellfish: (1) disease; (2) freezing trauma; (3) acute toxic effects of oil; (4) acute toxic effects of other contaminants; (5) low salinity; and (6) low-level oil toxicity. Both experts ruled out "suspects" one through four. Dr. Neff ruled out low-level oil toxicity (in part because studies hadn't been done demonstrating the minimal levels of oil particles which would produce such lesions) and ruled in low salinity (largely by inference—it was the most probable cause in his mind once he had eliminated the others). To quote from his testimony:

So basically my feeling and my expert opinion based on all the data is that the oysters in Silver Point were exposed to low salinity, not sufficiently low to cause the anaerobic response, but sufficiently low to stress the oysters and over a long period of time cause the histopathological lesions in the gills that Dr. Elston reports. (R.T. p. 52, Neff testimony).

And again, at another point, when he was asked to elaborate on his opinion:

Really all it says [referring to evidence that samples from the oysters revealed a high water content in their tissues] is that he [the oyster] was being exposed to low salinity. It—presumably it was within the range of tolerance because he was still alive and functioning. But whether he was stressed or not, I can't say for sure. But as I say, from all the other evidence and indications from historic data, that salinity periodically gets lower than the level where he can tolerate for long periods of time. I would suggest that perhaps that was what was happening in the spring of 1999 or late winter of 1999. (R.T. p. 53, Neff testimony).

Dr. Elston, in contrast, used historic rainfall data and other factors to eliminate low salinity as the mortality cause. That left him with contact oil toxicity as the most probable explanation. Again, as he put it:

[I]f we take the New Carissa oil exposure out of the equation, there is no other explanation for the oyster mortality. (R.T. p. 79, Elston testimony).

It is of interest that the defendants concede that Dr. Elston's science was certainly reliable enough to address the salinity issue before the jury. Yet after he eliminated all of the potential causes save one (low-level oil toxicity), defendants contend it offends *Daubert* to allow Dr. Elston to address the last suspect left in his lineup. Because there are no published, peer-reviewed studies purporting to identify the precise minimum levels of oil contaminants that would produce lesions in oysters, defendants argue that Dr. Elston's opinion is an untested and thus unreliable hypothesis. In fact, they contend that it was such bad science that he (and presumably Dr. Neff as well) erred in including low-level oil toxicity in the differential diagnosis in the first instance as one of six possible causes of death.

I find it somewhat difficult to accept the notion that—notwithstanding the New Carissa oil spill, with some of its oil coming into contact with plaintiffs' oysters and the demise of over three million of them shortly thereafter—it was bad science to include

the New Carissa oil in the diagnostic post-mortem.

Indeed, the oil sheen regulation (considered by Dr. Elston in his approach to the oyster mortality event—see discussion, *infra*) would seem to make it prudent science for a marine biologist to have taken a hard look at the possibility that the Clausens' oysters were harmed by the New Carissa's oil.

At any rate, defendants make too much of the "published studies" factor under *Daubert. Daubert* itself states:

> Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability . . . and in some instances well-grounded but innovative theories will not have been published. . . . Some propositions, moreover, are too particular, too new, or of too limited interest to be published.

509 U.S. at 593, 113 S.Ct. 2786.

Both Dr. Elston and Dr. Neff agreed that oil spills generate studies when the larger ones occur (e.g. Exxon Valdez and Amoco Cadiz). The impact of oil particulates on shellfish in tidal basins does not lend itself to controlled experiments—among other obstacles, the Clean Water Act and the Oil Spillage Act would seemingly preclude intentional spillages for experimental purposes.

Another obstacle to published studies is presented by the realities of litigation. During a discovery dispute, for example, the court learned that Dr. Elston had prepared a report on the impact of an oil spill in Humboldt Bay, California, but that, pursuant to a settlement agreement that was reached in that case, the report was to be kept confidential. Nonetheless, this court ordered his report to be the proper subject of disclosure and cross-examination in the context of this litigation.[2] Although his report on the Humboldt Bay oil spill (entailing some four to five thousand gallons of oil) has not been published, Dr. Elston testified that he identified gill lesions in oysters in that spill which he connected to the oil (the oysters recovered, and there was no mortality associated with the contact).

Moreover, it is not accurate to say that there are *no* published studies supporting Dr. Elston's testimony. At trial, Dr. Elston identified a prior report of Dr. Neff himself in which he noted the appearance of "cancer like lesions in bivalves [oysters] from oil spill sites, [which] may result from petroleum mediated decrease in resistance to infection with pathogenic organisms."

Perhaps the main thrust of defendants' objection is best expressed in a question by defense counsel addressed to Dr. Elston:

Q. Isn't it true that there's no published studies that have ever been done to *quantify these sort of exposure levels* causing contact toxicity and causing death to oysters? (emphasis added)

A. Well, specific to this mechanism in oysters?

Q. Yes.

A. This is not published. (R.T. p. 85, Elston testimony).

But Dr. Elston also went on to say that "the case for general causation is well established in the literature for contact toxicity." He then described documented studies in humans and other animals, such as mice.[3]

---

2. *See* R.T., Pretrial Conference, pp. 55–59.

3. In pertinent part, Dr. Elston testified: "[W]e certainly know that contact toxicity is a mechanism that occurs in virtually every animal system in which it's been studied, and we know that the effects of oil and various other toxicants are a function of dose and duration." (R.T. p. 41, Elston testimony).

That such specific studies of oysters await another day should not, in my view, preclude Dr. Elston's testimony on the subject. As the Court noted in *Daubert,* some propositions are too new, too particular or of too limited interest to be the subject of published studies. Plaintiffs should not be denied their day in court simply because the science which tells us the precise quantities of oil necessary to produce gill lesions in oysters has not yet been developed and published.

Again, to return to *Daubert:*

[I]t would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science.

And—

[I]n order to qualify as "scientific knowledge", an inference or assertion must be derived from the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds", based on what is known.

Dr. Elston developed his opinion from a valid and reliable scientific method—the differential diagnosis methodology. Both experts had "good grounds" from the data and known facts, including the literature, to proffer their opinions on the cause of the oyster mortality. That they differed in their respective conclusions does not mean that one or the other used "bad" science. This gatekeeper was and remains of the view that defendants' objections go to the weight of Dr. Elston's testimony—not to its admissibility.

### 2. *The "oil sheen" regulation.*

I turn next to defendants' argument that permitting the jury to hear evidence about 40 C.F.R. § 110.3 (the "oil sheen" regulation) was error.

This seems much ado about nothing. All the oil sheen regulation does is state that the government has determined that an oil discharge which causes a film or sheen on the surface of the water "may be harmful . . . to the environment."

The key word is "may." The regulation does little more than state the obvious. The jury was not instructed that there was any presumption that visible oil spills harmed the environment, or that the regulation shifted the burden of proof in the case. The regulation was briefly displayed on an overhead as it was read by Dr. Elston as one of the factors he considered as an expert.

The court is somewhat baffled by defendants' post-trial motion regarding this issue. At the pretrial conference, we had the following discussion about the matter:

THE COURT: Mr. Zilbert [defense counsel], what exactly do you want the court to do with respect to this regulation? They are not claiming any presumption anymore, but they want Dr. Elston to be able to testify that one of the factors he considered when he did his analysis and came to his conclusions is . . . this regulation that a sheen of oil may indeed be harmful.

MR. ZILBERT: Right. They seem to be treating it now as evidence as opposed to the law. And to the extent that Dr. Elston relied upon it, we don't—*we don't object to his testifying about that. We'd like to cross-examine him about that* . . .

So if Dr. Elston is going to say, I relied on this regulation, *to that extent we don't object to its coming before the jury.* But we don't believe that it should come in as a piece of substantive evidence about causation on oysters.

THE COURT: As I say, the regulation rather begs the issue, but I will permit Dr. Elston to testify that he considered the regulation in his analysis and in forming his opinion. But I will grant the motion [in limine] in the

sense that I will not instruct the jury that that [the regulation] creates a rebuttable presumption or constitutes some form of negligence per se.

At this point, counsel for plaintiffs interjected that he still wanted to introduce the regulation "as evidence", and admit it as an exhibit in the case, along with the Federal Register entry enacting the original regulation. After further discussion, the court rejected the regulation as a formal exhibit, ruling that Dr. Elston would simply be allowed to read the regulation and that plaintiff could display it on the screen as he did so. (*See* R.T., Pretrial Conference, pp. 21–28).

■ Other than allowing plaintiff to project the regulation onto a screen as Dr. Elston read it aloud, the defense would seem to have gotten its way on the business of the sheen regulation. It was not formally introduced into evidence. And since the court was told that the defense wanted it before the jury so that they could cross-examine Dr. Elston about it,[4] it is impossible to imagine that the defense suffered some substantive prejudice by having a brief overhead projection simultaneous with an oral recitation.

Furthermore, defendants had every opportunity to address the regulation to diminish its now imagined effect on the jury. At the hearing on the motion for a new trial, defendants conceded that, for tactical reasons, they did not want to draw attention to the oil sheen regulation and thus they gave it the cold shoulder. But the regulation, and unobjected-to testimony reading the Federal Register excerpt explaining in part its background, clearly did not have the prejudicial impact on the case hypothesized by the defendants. The jury was never given any hint of a negligence

per se theory, nor was it ever instructed or otherwise told that "*actual harm* relating to an oil spill is *presumed to occur* where a mere 'sheen' of oil is present ..." (Defendant's Memorandum (# 212) at 16).

This concern of the defense about the possible impact of the oil sheen regulation could easily have been dealt with at trial with a limiting instruction. None was submitted. At the ruling on defendants' motion in limine, the court pointed out to counsel the permissive terminology in the regulation, i.e., "may be harmful" and commented that there was no presumptive effect. Counsel had the opportunity to point out the limited probative value of the regulation either through his cross-examination of Dr. Elston, his direct examination of Dr. Neff, or through a proffered instruction. Having chosen the tactic of ignoring the regulation altogether, the defense should not now be allowed to magnify its purported effect on the outcome, especially where it informed the court beforehand that it wanted the regulation before the jury for its own purposes.

The regulation was relevant because it was considered by Dr. Elston in formulating his opinion. It was but a minor part of the landscape he surveyed as an expert. Not even he pretended that the regulation proved or even helped prove that the New Carissa oil actually caused the oyster deaths in this case. All the regulation did was articulate the general and patently obvious proposition that visible discharges of oil may have adverse impacts on marine life.

### 3. *The multiple causation instruction.*

At trial, plaintiffs requested that the following instruction be given regarding causation:

---

4. Apparently counsel changed his mind, because the matter was not inquired into on    cross-examination.

An injury is "caused" by an act if the act is a substantial factor in bringing about the injury. In order to determine that oil discharged from the NEW CARISSA was a substantial factor in causing injury to Plaintiffs or to Plaintiffs' property, you must find by a preponderance of the evidence that it is more likely true than not true that:

(1) The injuries to Plaintiffs or Plaintiffs' property would not have occurred but for the oil spill; and

(2) The oil spill was so important in bringing about the injuries to Plaintiffs or Plaintiffs' property that a reasonable person would regard it as a cause and attach responsibility to it.

This does not mean that the law recognizes only one legal cause of an injury, consisting of only one factor or thing, or the conduct of only one person. On the contrary, many factors or things, or the conduct of two or more persons, may operate at the same time, either independently or together, to cause an injury; and in such a case, each may be a legal cause.

You must find that the oil from the NEW CARISSA was a cause of the injury if the oil played any part, *no matter how small,* in bringing about the injury to Plaintiffs or Plaintiffs' property. Therefore, even if the oil operated in combination with the acts of another, or in combination with some other cause, the oil was a legal cause of the injury if it played any part, no matter how small, in bringing about the injury.

(emphasis supplied).

The court rejected this proffered instruction, and instead gave the following:

In order to be a cause of plaintiffs' damage, the M/V NEW CARISSA oil must be a substantial factor in producing the damage. A substantial factor is an important or material factor and not one that is insignificant.

Yet, given the conflicting diagnoses of Drs. Elston and Neff, there was evidence in the case from which the jury could well conclude that the oysters were impacted by both the New Carissa oil and low salinity conditions. As Dr. Neff put it, in his opinion salinity levels had been "sufficiently low to stress the oysters . . ."

The jury was not bound to accept either expert's opinion *in toto.* It could, for example, have accepted Dr. Neff's opinion that the oysters had been stressed (weakened) by excessive freshwater, but nonetheless have credited Dr. Elston's opinion that oil—not salinity levels—caused the lesions.

Thus the jury could have determined, from the evidence as a whole, that there was more than one thing going on in the lives of the oysters during the winter of 1998–99 to damage them. Accordingly, the following instruction on multiple causation was given:

Many factors or things may operate either independently or together to cause damage. In such a case, each may be the cause of the damage even though the others would have been sufficient of themselves to cause the same damage. You need not find that the conduct of the defendant was the only cause of the damage.

Defendants contend that the instruction was improper because neither expert opined that a *combination* of low salinity and oil exposure killed the oysters. However, defendants provide no caselaw on point making such testimony a prerequisite, and a jury is not limited to an "either-or" proposition served up by the advocates; the jury is free to sift through the conflicting evidence, accepting part of each expert's testimony, while rejecting other parts as it sees fit. (*See* Instruction 3.8,

NINTH CIRCUIT MANUAL OF MODEL JURY INSTRUCTIONS, which was given to the jury in this case). It is the sole and virtually unfettered prerogative of the jurors to resolve credibility issues.

■ Thus, notwithstanding that plaintiffs discounted salinity and defendants discounted oil in their explanations for the oyster mortality, the jury could have rationally found that both were somehow in the mix.

Furthermore, the defendants could not have been prejudiced by the multiple causation instruction. The jury was instructed no less than *four* times that the plaintiffs had the burden of proving that New Carissa oil killed the oysters. In addition, the verdict form contained the special interrogatory:

> Did oil from the M/V NEW CARISSA cause the death of oysters owned by plaintiffs?

Thus, in order to return a verdict for plaintiffs, the jury had to find that the New Carissa oil was a substantial factor [5] in causing the oyster deaths.

The multiple causation instruction correctly stated the law and was warranted by the evidence in this case.

### CONCLUSION

Defendants' motion for judgment as a matter of law or for a new trial (# 211) is denied.

---

[5.] One might also observe that the "substantial factor" causation instruction by implication raised the possibility of "other factors" or "causes" that may have played a part in the oyster deaths.