[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 17, 2012
JOHN LEY
CLERK

_____

No. 11-12296

_____

D.C. Docket No. 7:08-cv-00013-HL

SOUTHERN STATES COOPERATIVE, INC.,

                                                        Plaintiff - Appellee,

versus

MELICK AQUAFEEDS, INC.,
MELICK AQUAFEED, LLC,

                                                        Defendants - Appellants.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(April 17, 2012)

Before EDMONDSON and WILSON, Circuit Judges, and VINSON,* District
Judge.

_____

*Honorable C. Roger Vinson, United States District Judge for the Northern District of
Florida, sitting by designation.

PER CURIAM:

Southern States Cooperative, Inc. ("Southern States") is a commercial producer of tilapia with facilities in multiple states. In or around 2003, it began buying feed from Melick Aquafeeds, Inc., and, a few years later in 2006, from Melick Aquafeed, LLC ("Melick," collectively). In October 2006, Southern States noticed a decline in the growth of its tilapia and a decrease in feed consumption by the fish. Southern States then began testing each shipment of feed to see if it complied with Melick's guarantees regarding fat and protein content. After discovering that some samples of feed that were tested did not comply, Southern States brought this suit for breach of warranty, negligent misrepresentation, and fraud.

In preparation for trial, Southern States retained Dr. Steven Craig, a doctor of fish nutrition, and Melick retained Dr. Donald Davis, a professor of fish nutrition. Both parties filed motions to exclude the other's expert testimony; both motions were denied. During trial, Dr. Craig testified regarding the causal link between fat and protein levels in feed and fish growth.

At the close of evidence, Melick moved for a directed verdict on Southern States's claim for lost profits, but the district court stated that it would defer its ruling until after trial. The jury then found that Melick had breached its warranty

2

and awarded Southern States $770,229.30 in lost profits. Because the district court had not ruled on the motion it had previously deferred, Melick filed a renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) (or a new trial) regarding damages. The district court denied that motion.

Melick now appeals on two grounds: (1) that the district court abused its discretion in allowing Dr. Craig to testify regarding causation and (2) that Southern States's damages award is impermissible. After review and argument, we affirm.

## I.

Melick argues that the district court erred in permitting Dr. Craig to testify because his theories were unscientific and unreliable. We review evidentiary rulings for abuse of discretion and may only reverse if there was substantial prejudice to the aggrieved party. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1276 (11th Cir. 2008). A district court may not admit an expert opinion if the supporting methodology for the opinion is not "'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*.[1]'" *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *City of*

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 2794 (1993).

*Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Under

*Daubert*, a court evaluates the reliability of methodology by considering "(1)

whether the expert's theory can be and has been tested; (2) whether the theory has

been subjected to peer review and publication; (3) the known or potential rate of

error of the particular scientific technique; and (4) whether the technique is

generally accepted in the scientific community." *McCorvey v. Baxter Healthcare*

*Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (citing *Daubert*, 509 U.S. at 593–94,

113 S. Ct. at 2796–98).

Dr. Craig testified to the following: Fish feed contains a mix of protein and

fat. Fat, unlike protein, induces satiety in fish. Therefore, a high fat content in

feed limits the quantity a fish can eat. If a fish were to consume a smaller quantity

of feed, that would decrease its intake of growth-inducing protein, resulting in a

depression of growth. This effect would be exacerbated if protein levels were

lower than average in the feed. In Dr. Craig's words, "the worst possible

combination is a really high fat diet combined with a low protein diet, cause, as I

mentioned earlier[,] the fish, he eats to satisfy his energy requirement, so if he's

got a lot of fat in that diet, he's going to stop eating before he gets enough protein

to grow." On appeal, Melick does not challenge the validity of this theory of

causation or the scientific methodology that supports it.

However, Dr. Craig also testified that the fluctuations in the feed's fat-to-protein ratios were harmful to fish. He admitted that no scientific studies have been conducted to support his comments that variations in feed composition can inhibit the growth of fish. Melick, arguing that this testimony about fluctuation created prejudice, asserts: "Because plaintiff presented *no other evidence of causation*, the jury had to have accepted Craig's *causation theory that the fluctuation* in protein to fat levels caused the decrease in growth in plaintiff's fish," (emphases added) and juries give great weight to expert testimony.

We cannot agree with Melick's assertion of prejudice and its characterization of Dr. Craig's testimony. Mark Twain advised, "Do not tell fish stories where the people know you; but particularly, don't tell them where they know the fish."[2] In this case, we know the fish—and the facts—and by no means was the "fluctuation theory," as Melick has dubbed it, Dr. Craig's sole (or even primary) theory of causation. Dr. Craig only mentioned the effect of fluctuating nutrient levels a few times in his extensive testimony, and those remarks were independent of his main causation theory that low levels of protein and high levels

---

[2] *See Mark Twain: Collected Tales, Sketches, Speeches, & Essays, 1891-1910*, 942 (Louis J. Budd ed., Literary Classics of the United States 1992).

of fat can slow fish growth.  Because we do not find that admission of Dr. Craig's testimony created substantial prejudice to Melick, we will not reverse that evidentiary ruling.

Melick also contends that Dr. Craig's differential etiology was deficient. Differential etiology is a process of elimination in which (1) an expert compiles all possible causes of an injury, *see Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010), and (2) he rules out each of the potential causes "until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely," *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (per curiam) (citation and quotation marks omitted).[3] When ruling out causes in the second step, an expert "must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Hendrix*, 609 F.3d at 1197 (quoting *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1058 (9th Cir. 2003)).

Melick argues that Dr. Craig failed to complete step two because he did not scientifically rule out alternative causes for the slowing of fish growth, but instead

---

[3] *Guinn* uses the term "differential diagnosis" rather than "differential etiology," but explains that it is simply following "the trend among federal courts . . . [to] use the term differential diagnosis to refer to both concepts."  602 F.3d at 1253 n.6.

"assumed them away." Melick contends that all of the following could have been causes: poor water quality or temperature, changes in feed, disease, faulty equipment, or overstocked tanks. Southern States correctly points out that Dr. Craig addressed these factors, testifying to the following: Tilapia are hardy fish capable of thriving in a variety of water conditions. Any problems with water conditions are usually caused by feed—either pollution of the water because fish have not consumed the standard amount of feed or increased ammonium levels from improper protein content. Changes in feed only affect fish for one or two days and then they will resume normal eating habits. Virulent bacterial strains are the major disease affecting tilapia, but "everything will die" if bacteria afflicts a tank. Given that the mortality rate in the tanks was low, a bacteria infection was unlikely. Southern States employed daily monitoring procedures to examine water quality and equipment.

Melick labels Dr. Craig's rationale as unscientific, but it fails to adequately explain what deficiencies it finds in his methodology or procedures. It appears that Melick really just disagrees with Dr. Craig's statements; in substance, Melick asks the court to reverse on the ground that Dr. Craig has not provided persuasive or sufficient explanations for ruling out causes. However, the court's role as a gatekeeper "is not intended to supplant the adversary system or the role of the

jury: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2786). Melick's contentions speak to the weight to be afforded Dr. Craig's testimony, not its admissibility, and are thus not within our province to evaluate.[4]

## II.

Melick also challenges Southern States's damages award. We review *de novo* the district court's denial of Melick's motion for judgment as a matter of law under Rule 50. *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1251 (11th Cir. 2007). In our review, we draw all inferences in favor of the non-moving party. *Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1343 (11th Cir. 2003). We "affirm the jury verdict unless there is no legal basis upon which the jury could have found for [the plaintiff]." *Telecom Technical Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 830 (11th Cir. 2004).

Melick argued before the district court that Southern States had not

---

[4] Melick makes much of the fact that the district court appeared to suggest in a post-trial order that its *Daubert* ruling with regards to Dr. Craig may have been incorrect. While there may arguably have been some deficiencies in Dr. Craig's assumptions and testimony (e.g., his failure to independently test the water quality in the tanks), those issues were subject to rigorous cross-examination, were satisfactorily explained, and were properly left to the jury to consider. Any error was harmless.

submitted sufficient evidence to prove its lost profits to a reasonable degree of certainty. On appeal, Melick contends that a lost profits measure of damages is inappropriate and that Southern States should only recover for its *delay* in receiving profits. Because this delay argument was not raised below, we decline to consider it. *See BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1140 (11th Cir. 2007) ("As a general rule, we do not consider issues not presented in the first instance to the trial court.").

Melick argues in the alternative that if a lost profits measure of damages is correct, Southern States failed to properly prove its anticipated expenses. Under Georgia law, a plaintiff seeking recovery of lost profits must typically prove both anticipated revenues and expenses with reasonable certainty in order to recover. *Bennett v. Smith*, 267 S.E.2d 19, 20 (Ga. 1980). If a plaintiff can show that expenses remained essentially the same during the period at issue, the jury is authorized to award the plaintiff its lost revenues during that period as lost profit damages. *See id.* (allowing jury's award of lost revenues as a lost profits measure where plaintiff egg farm operators showed that farm expenses remained stable during the period of decreased production resulting from defendant's contaminated feed).

The jury here awarded Southern States lost profits of $770,229.30—an

amount equal to its alleged lost revenues. Lisa Della Monica of Southern States testified that Southern States's expenses remained stable during the time period at issue in this case. Melick argues (without pointing to any evidence in support) that her testimony must be incorrect because there are a number of variable costs associated with raising fish. Because the jury was entitled to credit Della Monica's testimony as true, and therefore was permitted to conclude that lost revenues equaled lost profits, *Bennett*, 267 S.E.2d at 20, we affirm.

**AFFIRMED.**